UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PHILLIP SAYLOR,<br>ELIZABETH SAYLOR,<br>EL SAYLOR,<br>T SAYLOR,<br>A SAYLOR,<br>EM SAYLOR,<br>G SAYLOR,<br><br>Plaintiffs,<br><br>v.<br><br>ADAM KRUPP,<br>KRISTA GARRETT,<br>KELLY BROYLES,<br>ALEAGH CAMPBELL,<br>KRISTINA CLANIM,<br>CASSANDRA GREENWALT,<br>MAKYLA MANSFIELD,<br>ANDREA WILSON,<br>SARAH ALMACK,<br>BRIANNE HENSLEY,<br>INDIANA DEPARTMENT OF CHILD SERVICES,<br><br>Defendants. | ) | No. 1:25-cv-01820-JRS-MJD |

**Order on Motion to Dismiss**

Plaintiffs Phillip and Elizabeth Saylor assert claims under 42 U.S.C. § 1983 and state law on their own behalf and on behalf of their adopted and fostered children. Their claims stem from the Indiana Department of Child Services' seizure of their adopted child and two foster children and the subsequent state court proceedings against them.

Defendants have filed a Motion to Dismiss. (ECF No. 23.) For the following reasons, Defendants' Motion is **granted in part and denied in part**.

## I. Background[1]

Phillip and Elizabeth Saylor are married and live in Muncie, Indiana. (Am. Compl. ¶¶ 7–9, ECF No. 17.) In September 2023, the Saylors were licensed foster parents with five children under their care. (*Id.* ¶ 10.) The Saylors had adopted some of those children and were in the process of adopting others. (*See id.* ¶¶ 10, 36.) One of the adopted children, El.S., was then fourteen years old. (*Id.* ¶¶ 10, 21.) El.S. had been placed in eighteen different foster homes before meeting the Saylors. (*Id.* ¶ 76.) She struggled with several mental health diagnoses, including oppositional defiant disorder, major depressive disorder, and borderline personality disorder. (*Id.* ¶ 40.) El.S. was engaged in therapy to work through these issues. (*Id.* ¶ 41.) The Saylors initially elected to homeschool El.S. but later reenrolled her in public school in August 2023 after seeing some progress. (*Id.* ¶ 42.)

In September 2023, however, El.S. ran away. (Am. Compl. ¶ 21.) The Saylors had discovered that El.S., who was only permitted to use a flip phone, had stolen a smartphone and created several Snapchat accounts to communicate with adult men. (*Id.* ¶¶ 22, 43.) El.S. had also created accounts to share nude images of herself online. (*Id.* ¶ 22.) On September 20, El.S. had arranged to be picked up from her home by

---

[1] At this stage, the Court accepts the Saylors' well-pleaded allegations as true. *See Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010) ("When evaluating the sufficiency of the complaint, we construe it in the light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in her favor.").

the adult men. (*Id.* ¶¶ 21, 23.) The Saylors immediately reported to law enforcement that El.S. had run away. (*Id.* ¶¶ 21, 24.) The next day, law enforcement located her in Indianapolis. (*Id.* ¶ 25.) El.S. was intoxicated and stated that she had been sexually active with two adult men. (*Id.*) She further explained that she intended to travel to Chicago with one of the men. (*Id.*) El.S. was taken to Riley Children's Hospital, and DCS was contacted. (*Id.* ¶¶ 26–27.) While there, El.S. falsely accused the Saylors of making "mean" comments to her and being "very emotionally demeaning." (*Id.* ¶ 27.)

DCS Family Case Managers Aleagh Campbell and Cassandra Greenwalt then initiated a half-hearted investigation into the abuse allegations. (Am. Compl. ¶¶ 26–31.) Campbell and Greenwalt did not contact El.S.'s therapist or life skills coach to try to corroborate the allegations. (*Id.* ¶ 29.) And when they spoke with the Saylors' other children, the children disagreed with El.S.'s allegations about the Saylors and stated that it was El.S.—not the Saylors—who made them feel unsafe. (*Id.* ¶ 28.)

Even though the facts revealed that El.S.'s allegations were unfounded, Case Managers Greenwalt and Campbell—under the supervision of Director Garrett, and Supervisors Broyles and Clanim—quickly removed El.S., Em.S., and G.W. from the Saylors' home without getting a court order to do so. (Am. Compl. ¶¶ 28–31.) At that time, the Saylors were in the process of adopting G.W.[2] (*See id.* ¶ 36.) As a result of the events involving El.S., Andrea Wilson, Director of Grant County DCS, and

[2] G.W.—now G.S.—was adopted by the Saylors. (Am. Compl. ¶ 71.) Because, during the relevant time frame, G.S. had not yet been adopted, the Court refers to G.S. as G.W.

Makyla Mansfield, DCS Family Case Manager, withdrew DCS's consent to the Saylors' adoption of G.W. (*Id.*) Director Wilson knew that the facts did not support removing G.W. or opposing G.W.'s adoption. (*Id.* ¶ 37.) DCS also failed to timely provide a hearing for removing the children. (*Id.* ¶ 39.) Despite all these questions concerning the credibility of EL.S's allegations, DCS substantiated the allegations of neglect against the Saylors, (*id.* ¶ 35), so they could move forward with proceedings, *Nicole K. by next friend Linda R. v. Stigdon*, 990 F.3d 534, 536 (7th Cir. 2021) (stating substantiation is a prerequisite to filing a petition).

Defendants Campbell and Greenwalt then prepared and filed a petition in state court seeking to have El.S. declared a Child in Need of Services ("CHINS") due to alleged abuse or neglect by the Saylors—even though they knew those allegations were baseless. (Am. Compl. ¶ 29.) Defendants Campbell and Greenwalt deliberately omitted favorable material facts in the petition and included false and misleading information about the Saylors' care for the children. (*Id.* ¶¶ 29–30.) Supervisors Broyles and Clanim and Director Garrett—Campbell's and Greenwalt's managers—signed off on the petition knowing it was materially misleading. (*Id.* ¶ 31.)

El.S. was placed in foster care pending the outcome of the abuse and neglect CHINS proceeding. (Am. Compl. ¶ 44.) Despite the proven risks associated with it, Campbell and Greenwalt—with Broyles's, Clanim's, and Garrett's approval—gave El.S. a smartphone against the Saylors' wishes so that El.S. could "be like other teenagers." (*Id.* ¶¶ 44, 52.) El.S. then used that phone to make "contact with unknown men online while in the foster home." (*Id.* ¶52.) Also contrary to the

Saylors' wishes, Campbell and Greenwalt re-enrolled El.S. in public school. (*Id.* ¶ 44.) The Saylors further allege that Case Manager Greenwalt, Director Garrett, and Supervisor Broyles failed to ensure that El.S. received proper mental health services while she was in foster care. (*Id.* ¶ 47.) During that time, El.S.'s poor behaviors escalated. (*Id.* ¶ 45.) While in the foster home, El.S. made allegations against her foster parents and threatened to harm the other children. (*Id.* ¶ 46.) The foster parents ultimately requested that El.S. be removed from their home. (*Id.*)

The Saylors moved to dismiss the abuse and neglect CHINS case, though that effort proved unsuccessful. (Am. Compl. ¶ 32.) The motion to dismiss included a letter from El.S.'s therapist of six years who stated that the Saylors demonstrated "[no] history of dangerous/unsafe behaviors." (*Id.*) Case Manager Campbell, however, presented the state court with falsified information from the therapist that contradicted what the therapist put in her letter. (*Id.* ¶¶ 33, 41.) DCS also wrongly told the state court that, shortly after adopting El.S., the Saylors decreased the frequency of El.S.'s therapy to only once a month and improperly tried to obtain information about what El.S. conveyed to her therapist in therapy sessions. (*Id.* ¶ 41.) DCS then filed an amended CHINS petition based on those new allegations. (*Id.* ¶ 33.) Faced with contradictory allegations from the Saylors and DCS, the state court denied the motion to dismiss the abuse and neglect CHINS case. (*Id.* ¶ 33.) Foster Care Specialists Almack and Hensley then placed the Saylors' foster license on hold and ultimately revoked it. (*Id.* ¶¶ 20, 35, 61, 62.)

The Saylors also sought to convert the abuse and neglect CHINS proceeding into a CHINS proceeding on a different basis: that under Indiana Code § 31-34-1-6(1), El.S. was a "danger to herself and others." (Am. Compl. ¶¶ 38, 48.) But DCS—presumably Defendants Campbell, Greenwalt, Broyles, Clanim, and Garrett—declined to amend the petition to reflect these concerns. (*Id.* ¶ 48.) Instead, they doubled down—adding "more false allegations" regarding the abuse and neglect claims. (*Id.*)

Ultimately, the state court concluded El.S. was not a CHINS, and that the allegations of the Saylors' abuse and neglect were unfounded. (Am. Compl. ¶ 49.) So El.S. was returned to the Saylors' home. (*Id.* ¶ 51.) Five days later, on January 3, 2024, El.S. used the smartphone Defendants gave her to again run away from home—presumably motivated by her resumed inappropriate contact with men online. (*Id.* ¶¶ 53, 56.) El.S. remains missing. (*Id.* ¶ 54.)

Despite the state court's finding that El.S. was not a CHINS, DCS refused to course correct. Case Managers Campbell and Greenwalt, Director Garrett, and Supervisors Broyles and Clanim wrongly refused to unsubstantiate the allegations against the Saylors, (Am. Compl. ¶¶ 31, 49); Defendants refused to return the foster children that had been removed from the Saylors' care, as well as refused to withdraw DCS's objection to G.W.'s adoption, (*id.* ¶¶ 50, 60); and Foster Care Specialists Almack and Hensley refused to reverse the suspension of the Saylors' foster care license—even recommending the license be permanently revoked, (*id.* ¶ 61). The

Saylors assert that DCS dug in its heels to retaliate against the Saylors for their advocacy on behalf of their adopted and fostered children. (*See, e.g.*, *id.*)

After DCS finally withdrew its objection to G.W.'s adoption, the Saylors adopted G.W. on March 22, 2024. (Am. Compl. ¶ 71.) But DCS still refused to return Em.S. to the Saylors.[3] (*Id.* ¶ 72.) After many months, DCS reinstated the Saylors' foster license. (*Id.* ¶ 73.) But because of this saga between their family and DCS, the Saylors subsequently decided not to renew their foster license, and they no longer serve as foster parents. (*Id.* ¶ 74.)

In September 2025, the Saylors—on their own behalf and on behalf of their children—sued DCS and various DCS employees involved with their foster cases, bringing federal and state claims. Under federal law (§ 1983), the Saylors brought a First Amendment retaliation claim (Count XIV), a Fourth Amendment seizure claim (Count III), Fourteenth Amendment substantive and procedural due process claims (Counts I, II, IV, XI, XIII), a Fourteenth Amendment equal protection claim (Count XII), a conspiracy to violate civil rights claim (Count VII), and a frivolous litigation claim (also Count VII).[4] Under state law, the Saylors brought claims of malicious

---

[3] It is not clear whether Em.S. was returned to the Saylors' home. On one hand, the Amended Complaint does not mention her being returned to or adopted by the Saylors. (*See* Am. Compl. 72–80.) On the other hand, the Complaint brings the lawsuit on Em.S.'s behalf. This factual ambiguity is not relevant to any claims, however, because at the time of these events, the Saylors make clear that Em.S. was only their foster child.

[4] Count VII is entitled "Frivolous Litigation/Conspiracy to Violate Civil Rights under 42 U.S.C. Section 1983." (Am. Compl. 19, ECF No. 17.) Some factual allegations in the Count seem to relate to a frivolous litigation claim, (*id.* ¶ 124), and other factual allegations seem to relate to a conspiracy claim, (*id.* ¶ 125). Construing the pleadings "liberally," *Harrell v. Cook*, 169 F.3d 428, 431 (7th Cir. 1999), Count VII seems to

prosecution (Count V), abuse of process (Count VI), intentional infliction of emotional distress (Count VIII), negligent infliction of emotional distress (Count IX), and loss of consortium (Count X). Defendants filed a Motion to Dismiss, (ECF No. 12), but before the Court ruled on that Motion, the Saylors filed an Amended Complaint, (ECF No. 17). Defendants then filed this Motion to Dismiss. (ECF No. 23).

## II. Legal Standard

A 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted challenges "the legal sufficiency of a complaint" under Rule 8(a)'s standards. *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020). Under Rule 8(a), a complaint must contain a short and plain statement showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). The claim must be facially plausible, "plead[ing] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When considering a motion to dismiss, courts "take all the factual allegations in the complaint as true," and draw all reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678; *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016). A complaint is not required to identify legal theories, and "specifying an incorrect theory is not a fatal error." *Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011). Courts need not, however, accept the truth of legal conclusions. *Iqbal*, 556

---

raise two independent claims of frivolous litigation and conspiracy to violate civil rights.

U.S. at 678. And "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law," meaning the Rule's scope is not limited to claims which are "obviously unsupportable." *Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989).

## III. Discussion

Defendants move for dismissal of all claims under Rule 12(b)(6). They argue that the Eleventh Amendment bars "all official capacity claims," including "all claims against DCS," (Defs. Br. 4, ECF No. 24); state law bars the remaining state law claims for damages in their personal capacities, (*id.* at 4–5); they have absolute and qualified immunity, so the remaining federal claims are barred, (*id.* at 6–16); and, if any claims remain, the individual Defendants "were not sufficiently personally involved [in the alleged constitutional violations] to be held liable" under § 1983, (*id.* at 16–19). The Court addresses each argument in turn.

### A. Official capacity claims

Defendants argue that the Eleventh Amendment bars the claims against DCS and claims for damages against the DCS employees in their official capacities. (Defs. Br. 4, ECF No. 24; Defs. Reply 1–2, ECF No. 29.) The Saylors do not disagree. (Pls. Resp. 2–3, ECF No. 28-1.) But the Saylors argue, and Defendants concede, that the Eleventh Amendment does not bar some claims for prospective injunctive relief against the DCS employees in their official capacities. (*Id.*; Defs. Reply 2, ECF No.

29.) The Court agrees that sovereign immunity bars the official capacity claims and finds that most injunctive relief is barred, too.

The Eleventh Amendment "grants states immunity from private suits in federal court without their consent." *Nuñez v. Ind. Dep't of Child Servs.*, 817 F.3d 1042, 1044 (7th Cir. 2016). That immunity from suit extends to claims under federal and state law alike. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). Further, "a suit against a state official in his or her official capacity is . . . no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Thus, absent a state's explicit consent, a valid Congressional override, or waiver, suits against state actors are generally barred by the Eleventh Amendment. *See Ind. Prot. & Advoc. Servs. v. Ind. Fam. & Soc. Servs. Admin.*, 603 F.3d 365, 370 (7th Cir. 2010).

Here, sovereign immunity bars the official capacity claims. The State of Indiana has not consented to suit. Congress did not abrogate sovereign immunity in passing § 1983. *Will*, 491 U.S. at 66. Indeed, because States possess sovereign immunity, neither DCS nor DCS employees in their official capacities are suable "persons" within the meaning of § 1983. *Id.*; *Thomas v. Illinois*, 697 F.3d 612, 613 (7th Cir. 2012). Thus, all claims against DCS, and the damages claims—federal and state—against DCS employees in their official capacities, must be dismissed.

The Eleventh Amendment, however, does not bar suit for (1) prospective relief (2) against state officials (3) to stop ongoing violations (4) of federal law. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (citing *Ex parte Young*, 209 U.S. 123

(1908)). "*Young* treats public officials who violate federal law as renegades, acting *ultra vires*, who therefore may be enjoined without enjoining the state itself." *David B. v. McDonald*, 156 F.3d 780, 783 (7th Cir. 1998) (citing *Will*, 491 U.S. 58). But the doctrine cannot be used to control the State or its agencies. *Ind. Prot. & Advoc.,* 603 F.3d at 372. And *Young* does not apply "when 'federal law has been violated [only] at one time or over a period of time in the past,'" *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021) (quoting *Papasan v. Allain*, 478 U.S. 265, 277–78 (1986)), or when a party "alleges that a state official has violated *state* law," *Pennhurst*, 465 U.S. at 106 (italics in original).

Here, the Saylors allegedly seek *Ex parte Young* relief. They want injunctive relief "requiring [DCS] to adopt and implement policies to prevent wrongful detention, and loss or disappearance of children in state custody and ensure children receive the proper services while in state care." (Am. Compl. ¶ 158, ECF No. 17; *see* Pls. Resp. 3, ECF No. 28-1 (seeking change of "policies that contributed to the disappearance of [El.S.]").) They also seek injunctive relief requiring Defendants to stop retaliating against them and "correct [their] records"—presumably asking Defendants to unsubstantiate the now disproven abuse and neglect allegations. (*Id.* at 3; *see* Am. Compl. ¶¶ 126, 132.)

For their part, Defendants recognize that some "claims for prospective relief do not run afoul of the Eleventh Amendment." (Defs. Br. 1–2, ECF No. 29.)

Though the parties seem to agree that the claims for prospective relief may continue, (*see* Defs. Br. 1–2, ECF No. 29), *Ex parte Young* does not authorize most of

the Saylors' requested injunctive relief. "The Eleventh Amendment is unusual in that it does not strictly involve subject matter jurisdiction . . . , but a court may [also] raise the issue itself." *Ind. Prot. & Advoc.*, 603 F.3d at 370 (citations omitted). The Saylors mainly seek injunctive relief to reform DCS and change the policies that led to El.S.'s disappearance. (Am. Compl. ¶ 158, ECF No. 17; Pls. Resp. 3, ECF No. 28-1.) But *Ex parte Young* relief may not be used to commandeer the State or its agencies, *Ind. Prot. & Advoc.*, 603 F.3d at 372, so prospective relief aimed at changing DCS's policies must be dismissed.

The remaining requested injunctive relief—that Defendants stop retaliating against the Saylors and unsubstantiate the baseless abuse and neglect allegations, (Pls. Resp. 3, ECF No. 28-1)—also seems to go beyond the bounds of *Ex parte Young*. The Saylors claim Defendants "ignore[ed] court rulings" by refusing to unsubstantiate the allegations, seemingly suggesting that unsubstantiation in such circumstances is mandatory under *state* law. (Am. Compl. ¶¶ 126, 132, ECF No. 17.) But *Ex Parte Young* relief can be granted to remedy violations of only *federal* law. *Pennhurst*, 465 U.S. at 106. That said, the parties have not briefed whether refusal to unsubstantiate disproven abuse and neglect allegations could constitute a violation of, say, the federal Constitution such that *Young* relief is available. Absent briefing on that question, the Court leaves it for another day.

According to the allegations in the Complaint, this sliver of potentially viable prospective relief relating to *Young* relief could be granted against only some Defendants. The factual allegations in the Complaint reveal that Case Managers

Campbell and Greenwalt, Director Garrett, and Supervisors Broyles and Clanim are the individuals improperly "keep[ing] the substantiation in place." (*Id.* ¶¶ 31, 49.) By inference then, these Defendants would be the ones who could undo the substantiation if so required. The remaining Defendants—DCS Director Krupp, Director Wilson, Case Manager Mansfield, and Foster Care Specialists Almack and Hensley—according to the factual allegations in the Complaint, played no role in substantiating the allegations, so they presumably could play no role in unsubstantiating them either. "Liability is personal," *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013), but the Saylors have not alleged facts that would make these Defendants liable for this alleged misconduct. So the Saylors fail to state a claim for prospective relief against this latter group of Defendants.

* * *

For the above reasons, all claims against DCS and its employees in their official capacities, including the injunctive relief seeking institutional DCS reform, are **dismissed**. Claims seeking *Ex Parte Young* relief against individual Defendants[5] for violations of federal law arising from their refusal to unsubstantiate disproven allegations—to the extent such conduct constitutes a violation of federal law—may proceed against all but Defendants Krupp, Wilson, Mansfield, Almack, and Hensley because they were not involved in substantiating the allegations of abuse or neglect.

[5] Because all claims against DCS are dismissed, the remaining references to "Defendants" include only the individual DCS employees.

Because claims for damages against Defendants in their individual capacities do not implicate sovereign immunity, *Lewis v. Clarke*, 581 U.S. 155–156 (2017), the Court analyzes those remaining claims below.

**B. Personal capacity claims**

Defendants advance three arguments for dismissing the remaining claims for damages in their individual capacities: Indiana law immunizes them from personal liability for their employment actions, (Defs. Br. 4–6, ECF No. 24; Defs. Reply 2, ECF No. 29); they hold absolute and qualified immunity against the federal claims, (Defs. Br. 6–16, ECF No. 24; Defs. Reply 2–3, ECF No. 29); and the Complaint does not adequately allege each Defendant's personal involvement in violating the Saylors' constitutional rights, as required by § 1983, (Defs. Br. 16–19, ECF No. 24). The Court addresses each argument in turn.

**1. State law claims**

Defendants argue that the Saylors' state law claims against Defendants in their personal capacities must be dismissed because, under Indiana Code § 31-25-2-2.5, DCS employees cannot be personally liable for performance of their duties. (Defs. Br. 4, ECF No. 24.) The Saylors did not respond to this argument. *See Martin v. Jones*, 752 F. App'x 368, 369 (7th Cir. 2019), reh'g denied (Mar. 5, 2019) (complete failure to respond to argument results in waiver); *see also United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991))). Putting aside any waiver from

failure to respond, the Court agrees that Defendants are immune from personal liability for the Saylors' state law claims.

Indiana Code § 31-25-2-2.5 provides that DCS officers and employees "are not personally liable . . . for an official act done or omitted in connection with performance of [their] duties." Indiana state courts have interpreted this statute broadly—immunizing employees against liability for all "actions and omissions that could reasonably be seen to be within the[ir] duties." *D.L. v. Huck*, 978 N.E.2d 429, 435–36 (Ind. Ct. App. 2012) (affirming dismissal of several state law claims arising from allegations that DCS removed a child without notice or court order).

Here, state law immunizes Defendants against the Saylors' state law claims. The alleged misconduct—investigating abuse or neglect of a minor child, seizing that minor child and other foster children, filing a CHINS petition, and objecting to the adoption of a foster child—are all actions that "could reasonably be seen to be within [Defendants'] duties." *See Breitweiser v. Ind. Dep't of Child Servs.*, No. 1:15-cv-01687-TWP-MJD, 2016 WL 6989773, at *12 (S.D. Ind. Nov. 10, 2016) (concluding § 31-25-2-2.5 immunizes DCS employees even if they failed to follow DCS procedure).

Accordingly, the state law claims against Defendants in their personal capacity are **dismissed**. The Court thus does not address Defendants' argument that the personal capacity state law claims are also barred by the Indiana Tort Claims Tort Claims Act.[6] (Defs. Br. 5–6, ECF No. 24.) Because the state law claims against

[6] The Indiana Tort Claims Act contains two relevant provisions: the general immunity provision in Subsection b, and the carveout in Subsection c. (*See* Defs. Br. 5–6, ECF No. 24.) Defendants do not explain how this carveout, or the Tort Claims

Defendants in their official capacities were dismissed too, *see supra*, all state law claims—Counts V, VI, VIII, IX, and X—are **dismissed** in their entirety.

### 2. Federal constitutional claims

Defendants argue that the Saylors' remaining federal claims brought under § 1983 must be dismissed.

*a. <u>Absolute Immunity</u>*

Defendants first make an argument for absolute immunity. They contend that absolute immunity bars all or part of seven of nine federal claims. (Defs. Br. 6–8, ECF No. 24 (referencing Counts I, IV, VII, XI, XII, XIII, XIV).) More specifically, Defendants argue they are entitled to absolute immunity because these claims are based on their "testimonial and prosecutorial functions." (*Id.*) The Saylors respond that the immunity does not apply because they are not "challeng[ing Defendants'] discretionary advocacy in court." (Pls. Resp. 3, ECF No. 28-1.) The Court finds that Defendants hold absolute immunity against only one of the Saylors' claims. One miscellaneous *factual allegation* in another claim also relates to conduct for which Defendants hold absolute immunity. But Defendants do not hold absolute immunity against that *claim* because it is grounded in other factual allegations to which absolute immunity does not apply.

---

Act more generally, interacts with the higher immunity standard that applies to DCS employees exclusively. But because they argue the Tort Act immunity in the alternative to the DCS-specific immunity—and particularly because the Saylors waived any argument that these immunities do not apply by failing to respond to them—the Court addresses only Defendants' first argument for state law immunity.

Start with the immunity's parameters.

Absolute immunity applies only "sparingly." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (internal quotations omitted). Two primary types of absolute immunity exist. First, parties are immune from claims arising from testimony given in court. *Briscoe v. LaHue*, 460 U.S. 325, 334 (1983). Second, prosecutors are immune from claims arising from acts they take in their "role as an advocate for the State," which can include acts that occur before "the initiation of judicial proceedings." *Buckley*, 509 U.S. at 273. The Seventh Circuit has extended these immunities to "social worker[s] pursuing a child-custody case" because they act "like [both] a prosecutor and witness." *Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 825 (7th Cir. 2022).

Testimonial and prosecutorial immunities also coalesce to establish the level of protection a state actor receives against an alleged fabrication of evidence claim. Whether the immunity applies depends on the context and timing of the fabrication. If a prosecutor allegedly fabricated evidence during his role as advocate—during the judicial proceeding or in "preparation for the initiation of . . . judicial proceedings," such as evaluating the evidence or preparing trial presentation—he would be absolutely immune against such claims. *Buckley*, 509 U.S. at 272–273. By contrast, if he were accused of fabricating "false evidence during the preliminary investigation," *id.* at 275, or while "gathering . . . evidence," *Millspaugh v. Cnty. Dep't of Pub. Welfare of Wabash Cnty.*, 937 F.2d 1172, 1176 (7th Cir. 1991), he could receive only qualified immunity for such conduct.

Here, Defendants have absolute immunity against only the frivolous litigation claim of Count VII. That claim alleges that Defendants "filed [t]he action without any factual or legal basis." (Am. Compl. ¶ 124.) But Defendants filed the action in their "role as an advocate[s] for the State." *Buckley*, 509 U.S. at 273. Defendants thus hold absolute immunity for the act of initiating a proceeding, so the frivolous litigation claim must be dismissed. *See Milchtein*, 42 F.4th at 825.

One other factual allegation relates to conduct for which Defendants retain absolute immunity. As part of the procedural due process claim (Count XIII), the Saylors allege that Defendants "misrepresented facts to the court." (Am. Compl. ¶ 147, ECF No. 17.) But Defendants hold absolute immunity against claims arising from misconduct during a judicial proceeding. *Buckley*, 509 U.S. at 272–273.

But that claim also alleges facts to which absolute immunity does not apply. For example, the Saylors allege that Defendants "used fabricated evidence in child welfare proceedings." (Am. Compl. ¶ 148, ECF No. 17.) Construed liberally, this fabrication could plausibly have occurred during the investigation period. Indeed, in other places in the Complaint, the Saylors allege that Defendants began fabricating evidence and allegations even before they removed the children. (*Id.* ¶¶ 98–99, 125). And Defendants could hold only qualified immunity against this claim. *Buckley*, 509 U.S. at 275. The Saylors also allege, as part of that claim, that Defendants "utilized the false neglect finding . . . to continue to perpetuate [the] removal" of the children. (Am. Compl. ¶ 150, ECF No. 17.) It is unclear whether this statement is also referring to Defendants having fabricated allegations to remove the children in the first

instance, or if it is alleging that Defendants used such allegations to keep the children out of the Saylors' home even after the CHINS proceeding found the Saylors not abusive or neglectful. Either way though, those acts would have occurred before or after—but not during—the judicial proceeding, and Defendants thus would not hold absolute immunity for either act. *Buckley*, 509 U.S. at 272–273, 275. Construed liberally, then, the procedural due process claim is based largely on allegations for which Defendants could hold only qualified immunity. So the claim is not barred by absolute immunity.

The remaining factual allegations also arise from conduct for which Defendants could hold only qualified immunity. Defendants do not have absolute immunity for claims arising from their removing the children without cause. (Am. Compl. ¶¶ 88, 89, 95, 98, 100, 141, 150); *see Millspaugh*, 937 F.2d at 1176 (holding a social worker could receive only qualified immunity for her removal of children from their home). Neither do Defendants hold absolute immunity for post-proceeding conduct, *Buckley*, 509 U.S. at 272–273, 275, such as for refusing to return the children after the CHINS proceeding found no neglect or abuse had taken place, (Am. Compl. ¶¶ 126, 153, ECF No. 17), or for ignoring "court rulings" by refusing to unsubstantiate the records alleging abuse and neglect, (*id.* ¶¶ 126, 144, 149, 153). Defendants also have no claim to absolute immunity for alleged misconduct unrelated to their role as an advocate, such as creating an unsafe environment for El.S. while in foster care, including giving her a cell phone and enrolling her in public school, (*id.* ¶¶ 96, 106, 141), conducting interviews of the children in an improper and traumatizing way, (*id.* ¶¶ 126, 141),

withdrawing consent from adoption, (*id.* ¶¶ 89, 125, 144, 153), or revoking the Saylors' foster care license, (*id.* ¶¶ 89, 125, 144, 153). For all this conduct, Defendants could hold only qualified immunity.

Accordingly, the frivolous litigation claim is **dismissed**. Defendants also are fully immune from allegations based on misrepresentation before the state court, though the procedural due process claim may proceed based on the other factual allegations in that claim.

The Court analyzes the remaining federal claims through the qualified immunity lens or, where appropriate, the general 12(b)(6) framework.

*b. Qualified Immunity*

Defendants first claim they are entitled to qualified immunity for the remaining federal claims because they did not violate any of the Saylors' clearly established federal rights. (Defs. Br. 6–16, ECF No. 24.) The Saylors respond that their allegations are sufficient to defeat a 12(b)(6) claim of qualified immunity. (Pls. Resp. 4–5, ECF No. 28-1.) Defendants also argue that the Complaint does not adequately allege each Defendant's personal involvement in violating the Saylors' constitutional rights, as required by § 1983. (Defs. Br. 16–19, ECF No. 24.) The Saylors respond with Defendant-by-Defendant allegations of misconduct. (Pls. Resp. 7–9, ECF No. 28-1.) The Court finds that, for several Counts, the Saylors fail to state a claim—qualified immunity aside. For the remaining Counts, the Saylors state a claim against some Defendants but not others.

To state a claim under 42 U.S.C. § 1983, plaintiffs must allege that the defendants "deprived [the]m of a right secured by the Constitution or the laws of the United States, and that the defendants acted under color of state law." *Brokaw v. Mercer County*, 235 F.3d 1000, 1009 (7th Cir. 2000). Here, there is no question that Defendants, as DCS employees, acted under color of state law.

Section 1983 makes defendants liable only for their own violations of federal law. *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015). So a plaintiff alleging supervisorial misconduct must "allege that the defendant, through his or her own conduct, has violated the Constitution." *Id.* But this standard does not require the higher-up to have "participated directly in the deprivation." *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). A supervisor can be liable for his subordinate's misconduct if it occurred with the supervisor's "knowledge or consent," including "turn[ing] a blind eye" or demonstrating "deliberate, reckless indifference to the misconduct of subordinates." *Id.* (internal citations and quotation marks omitted). A claim alleging supervisorial misconduct should be dismissed under 12(b)(6) "only if there is no [plausible] set of facts consistent with the allegations in the complaint upon which relief could be granted." *Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001) (dismissing a respondeat superior § 1983 claim because the claim was doomed to fail given the facts alleged).

Qualified immunity generally shields government officials from liability unless they (1) "violated [the plaintiff's] constitutional right," and (2) "the constitutional right at issue 'was clearly established at the time of the alleged violation.'" *Fosnight*

*v. Jones*, 41 F.4th 916, 924 (7th Cir. 2022) (quoting *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017)). This immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). And "[w]hether a right is clearly established is a question of law." *McGrath v. Gillis*, 44 F.3d 567, 570 (7th Cir. 1995). A plaintiff can show that "the contours of a right are sufficiently clear" in several ways. *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473–74 (7th Cir. 2011) (alterations omitted) (quoting *Ashcroft v. al-Kidd*, 536 U.S. 731, 741 (2011)). For example, a plaintiff could "identify a closely analogous" case that holds such conduct illegal. *Brokaw*, 235 F.3d at 1022. Or he could show that "existing precedent . . . ha[s] placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (internal quotation marks omitted).

Although "qualified immunity questions should be resolved at the earliest possible stage of a litigation," *Anderson v. Creighton*, 483 U.S. 635, 646 (1987), that stage is rarely a motion to dismiss, *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). "Rule 12(b)(6) tests whether the complaint states a claim for relief. *Id.* And a plaintiff may state a claim—and thus survive a 12(b)(6) motion to dismiss—even if the defendant has "a potential affirmative defense" to the claim. *Id.* Plaintiffs simply have "no obligation to initially 'anticipate and overcome a defense of qualified immunity' in their complaint." *Hanson v. LeVan*, 967 F.3d 584, 597 (7th Cir. 2020) (citations omitted) (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 765 n.3 (7th Cir. 2000)). Furthermore, affirmative "defenses typically turn on facts not

before the court at [a 12(b)(6)] stage." *Brownmark Films*, 682 F.3d at 690. That, too, makes it difficult "at the outset of litigation, . . . [to] tell from a complaint whether qualified immunity applies." *Roldan v. Stroud*, 52 F.4th 335, 339 (7th Cir. 2022). Courts thus cannot expect plaintiffs to "anticipate and overcome a defense" to survive a 12(b)(6) motion, *Hanson*, 967 F.3d at 597 (citations omitted) (quoting *Jacobs*, 215 F.3d at 765 n.3), just because that defense is qualified immunity, *Roldan*, 52 F.4th at 340.

So qualified immunity should be decided on a 12(b)(6) motion only if—taking all alleged facts as true and taking plausible inferences in the plaintiff's favor—the defendant would still be immune. *Hanson*, 967 F.3d at 592 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). For prong one at the 12(b)(6) stage, a claim is "required only to allege—not prove—the deprivation of a constitutional right." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1090 (7th Cir. 2008). Under prong two, the Court may find a defendant has qualified immunity if, even "tak[ing] as given the plaintiffs' allegations," *Hanson*, 967 F.3d at 597, the alleged right at issue was not clearly established "at the time the violation is alleged to have occurred," *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019) (internal quotations omitted).

The Court addresses in turn the viability of each federal constitutional claim, either under the general 12(b(6) standard or under the qualified immunity standard appropriate at the motion to dismiss stage.

*i. Substantive due process, Counts I, II, IV, & XI*

The Saylors bring several substantive due process claims. The Saylors' claims stem from the Fourteenth Amendment "right to freedom from undue state interference with family relations," *Sebesta v. Davis*, 878 F.3d 226, 234 (7th Cir. 2017), and the right to be free from state-created danger, *Est. of Her v. Hoeppner*, 939 F.3d 872, 876 (7th Cir. 2019). The Court addresses Defendants' arguments in favor of dismissal claim by claim.

*Count I*

Count I alleges that that Defendants unconstitutionally intruded upon the autonomous family relationship in three ways: by removing the Saylors' adopted and foster children from the home "without lawful authority and in violation of [DCS's] own polic[ies] and protocol[s]," withdrawing consent for their pending adoption of G.W., and revoking their foster care license. (Am. Compl. ¶¶ 87–93, ECF No. 17.) Defendants address only the Saylors' arguments related to removal of the children. As such, the Court leaves for another day the viability of a substantive due process claim arising from Defendants withdrawing consent to adoption and revoking the Saylors' foster care license.

As to the alleged improper removal of children, Defendants argue that the Saylors did not have a due process right to remain with G.W. who, at the time, was their foster child, and that the removal of El.S. from the home was justified—and therefore not a violation of the Saylors' rights. (Defs. Br. 10–11, ECF No. 24.) The Court finds that the Saylors fail to state a claim against some Defendants because they were not personally involved in the alleged misconduct. The remaining Defendants hold

qualified immunity against claims arising from *G.W.'s* removal but not those arising from *El.S.'s* removal.

The Fourteenth Amendment right to familial privacy "includes the parents' right 'to bear and raise their children' and the child's right 'to be raised and nurtured by his parents.'" *Hernandez*, 657 F.3d at 478 (quoting *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 928 (7th Cir. 2011)). But this right is "limited by the compelling governmental interest in the protection of children[,] particularly where the children need to be protected from their own parents." *Brokaw*, 235 F.3d at 1019 (citing *Croft v. Westmoreland Cnty. Child. & Youth Servs.*, 103 F.3d 1123, 1125 (3rd Cir. 1997)). A State has an interest in "protecting children from their parents [only if] it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Id.*

Right off the bat, as noted, the Saylors fail to state a claim against some Defendants. Though Count I asserts that "Defendants, [family case managers], Supervisors, and Directors interfered with" the Saylors' rights, (Am. Compl. ¶¶ 88–89, ECF No. 17), the factual allegations in the Complaint reveal that only some Defendants were personally involved in the alleged improper removal of the children such that they could be held liable under § 1983, *Perez*, 792 F.3d at 781. The consistent allegations in the Complaint paint Case Managers Campbell and Greenwalt as personally involved in wrongly removing the children, (Am. Compl. ¶¶ 26–38, 30, 33, 41, ECF No. 17), and Director Garrett and Supervisors Broyles and Clanim as higher-ups who knowingly approved the unfounded removal, (*id.* ¶¶ 27,

31). According to the allegations in the Complaint, the remaining Defendants—DCS Director Krupp, Director Wilson, Case Manager Mansfield, and Foster Care Specialists Almack and Hensley—played no role in the children's improper removal. As such, the Saylors cannot state a claim against these Defendants who lacked personal involvement. *See Perez*, 792 F.3d at 781.

Moving to Defendants who *were* personally involved in removing the children, the Court addresses separately G.W.'s removal and El.S.'s removal because these claims come out differently.

First, G.W.'s removal. Even those Defendants who were personally involved in removing the children are entitled to qualified immunity on this claim because the Saylors did not have a clearly established right to remain with G.W. At that time, G.W. was the Saylors' foster child. And the claim that Defendants unconstitutionally removed G.W. fails on qualified immunity's first prong: "[F]oster parents do not have a constitutionally protected interest in maintaining a relationship with a specific foster child." *Dupuy v. Samuels*, 397 F.3d 493, 513 (7th Cir. 2005). Indeed, "[b]ecause [foster care relationships] can be ended by the state, foster families . . . enjoy[] a considerably more limited 'liberty' than natural families or those related by adoption." *Kyees v. Cty. Dep't of Pub. Welfare of Tippecanoe Cnty.*, 600 F.2d 693, 698 (7th Cir. 1979). As such, there is no right for foster families to stay together, even where, as here, the child had been placed with the foster family since birth and adoption was pending. *See, e.g.*, *Moore v. Davis*, 684 F. Supp. 3d 813, 828–29 (S.D. Ind. 2023); *Courtney v. Murphy*, No. 3:19-cv-00174-RLY-MPB, 2021 WL 12310140, at

*5 (S.D. Ind. Sep. 16, 2021); *Ramsey v. Glaser*, No. 1:18-cv-1543-JMS-TAB, 2018 WL 4846299, at *8 (S.D. Ind. Oct. 5, 2018) ("So, to sum up the existing case law in this Circuit, there is no categorical liberty interest in foster family relationships."). Because no such constitutional right exists, the personally-involved Defendants are entitled to qualified immunity on this claim.

Second, El.S.'s removal. Here, the personally-involved Defendants are *not* entitled to qualified immunity at this stage. At the time of removing El.S. from the home, El.S. was the Saylors' child in the eyes of the law. As such, the Saylors had a right to remain with her, and she had a right to remain with them. *See Hernandez*, 657 F.3d at 478.

Under prong one, the Saylors plausibly allege that Defendants violated their and El.S.'s rights to family autonomy by improperly removing El.S. from the home. Accepting all factual allegations as true, Defendants lacked "definite and articulable evidence giving rise to a reasonable suspicion" that El.S. was abused or was in "imminent danger of abuse." *See Brokaw*, 235 F.3d at 1019.

The Saylors claim that El.S.'s removal was rife with problems. Defendants Campbell and Greenwalt only half-heartedly investigated El.S.'s allegations against the Saylors. (Am. Compl. ¶¶ 27–30.) And they knew they lacked any legitimate basis to remove El.S. from the home but did so anyway. (*Id.*) To try to justify her removal though, Defendants filed "affidavits containing false and misleading statements alleging abuse and neglect," and intentionally failed to verify El.S.'s allegations against the Saylors by, for example, reaching out to El.S.'s therapist. (*Id.* ¶ 30.)

These Defendants also willfully ignored all evidence supporting the Saylors being fit parents: the other children's statements that they did not feel unsafe with the Saylors, (*id.* ¶ 28); the therapist's statement that the Saylors had never presented any safety concerns, (*id.* ¶ 32); the Saylors' extensive history of successful foster parenting, (*id.* ¶ 34); and the Saylors immediately notifying the police when El.S. ran away—including giving them all details about El.S. stealing a cell phone and conversing inappropriately with adult men, (*id.* ¶¶ 21–23). That prompt and full disclosure to police undercuts the inference that the Saylors were to blame for El.S.'s concerning behavior. Defendants may have reasonably been concerned about El.S.'s conduct, but, taking all inferences in the Saylors' favor, they lacked "definite and articulable evidence giving rise to a reasonable suspicion" that the Saylors were the cause of, or even a contributing factor to, El.S.'s situation. *Brokaw*, 235 F.3d at 1019. Thus, the removal of El.S. violated the Saylors' and El.S.'s rights to family integrity.

Defendants tell a different story about these events. But the Court can give their narrative no weight at the 12(b)(6) stage. *Iqbal*, 556 U.S. at 678. So, taking all inferences in the Saylors' favor, Defendants took the Saylors' child away based on allegations Defendants knew, or should have known, were false. Such actions would violate the Saylors' and El.S.'s substantive due process rights to familial privacy.

The question under prong two, then, is whether removing a child based on knowingly baseless allegations would be a violation of clearly established constitutional rights. Plainly, yes. "[A] reasonable person would have known that it was unconstitutional to use the government's power to cause, or conspire to cause,

the unjustified removal of a . . . child from his parents." *Brokaw*, 235 F.3d at 1022; *id.* (citing *Morris v. Dearborne*, 181 F.3d 657, 668 (5th Cir. 1999) ("It is beyond purview that any rational [government actor] could believe that governmental destruction of a family based on fabricated evidence is constitutionally allowed.")). Because this right is clearly established, the personally-involved Defendants hold no qualified immunity against this claim at this stage.

It may be true that "state actors who cause a child's removal are [usually] entitled to qualified immunity because the alleged constitutional violation will rarely—if ever—be clearly established." *Brokaw*, 235 F.3d at 1023. But the Court does not yet "know enough facts to determine where along the continuum this case falls." *Id.* As alleged, "the facts once uncovered may turn out to be so severe and obviously wrong that the [D]efendants should have known they were violating [the Saylors' and El.S.'s] constitutional rights." *Id.* (internal quotation marks and citations omitted). That possibility is why this claim may proceed at this stage.

The substantive due process claim for G.W.'s removal is **dismissed**. The Saylors state a claim that El.S.'s removal violated her and the Saylors' rights against Defendants Campbell, Greenwalt, Garrett, Broyles, and Clanim. But they do not state a claim against Defendants Krupp, Wilson, Mansfield, Almack, and Hensley because they were not personally involved in removing El.S.

*Count II*

Count II alleges Defendants infringed on the Saylors' rights to direct the care, custody, and control of G.W. and El.S. by, contrary to the Saylors' wishes, giving El.S.

a cell phone and enrolling her in public school while she was in foster care. (Am. Compl. ¶¶ 87–93, ECF No. 17.) Defendants respond that under the circumstances, they did not take improper action by placing El.S. in public school. (Defs. Br. 11–12, ECF No. 24.) They do not respond to the Saylors' allegations regarding El.S. improperly receiving a cell phone. (*See id.*) The Court finds that Defendants hold qualified immunity against this Count.

Generally speaking, parents have the right to direct the care and upbringing of their children. *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925). This includes the right to direct a child's education. *Id.* But like most Fourteenth Amendment familial rights, this right is "not absolute." *Hernandez*, 657 F.3d at 478.

Here, all Defendants are entitled to qualified immunity.

To start, the Saylors had no right to direct the care and control of G.W., their foster child. They do not even allege any facts to show how this alleged right was infringed. Lack of specificity in the allegations aside, the Saylors had no right to direct G.W.'s upbringing at that time. If foster parents do not have the lesser right to maintain a relationship with a foster child, *Dupuy*, 397 F.3d at 513, they do not have the more expansive right to direct the control and upbringing of that child once they leave the foster parents' care.

As it relates to El.S., the Saylors do not point to—and the Court could not find—any case establishing that a parent has a right to direct their child's technology use and homeschool preferences while the child is in foster care. As to the schooling

preference, it is hard to imagine how the Saylors could have a right to dictate that El.S. be homeschooled in foster care given the burdens that mandatory homeschooling would place on a foster family. Though the Saylors have a right to direct El.S.'s upbringing, they do not have the right to dictate her schooling and technology use while in foster care.

And even if the Saylors had those rights, they are not clearly established. Indeed, a case like this—where parents seek to direct their child's schooling and technology use while the child is in foster care and the parents are being investigated for abuse and neglect—presents difficult questions about parental rights. The fact that these questions are difficult shows that these rights are not clearly established, and therefore that Defendants are entitled to qualified immunity.

Accordingly, Count II is **dismissed**.

*Count IV*

Count IV also alleges a violation of the Saylors' substantive due process rights. This claim focuses on "the right to raise their children as they see fit." (Am. Compl. ¶¶ 105–106, ECF No. 17.) Defendants argue that this count is duplicative of the earlier substantive due process counts. (Defs. Br. 13, ECF No. 24.) The Court agrees with Defendants.

Count IV, like Count II, focuses on the Saylors' rights as parents to direct the upbringing of their children. Because Count II was dismissed for failure to state a claim—and because the Court can dismiss a claim for being duplicative of another

claim in the complaint, *Levy v. W. Coast Life Ins. Co.*, 44 F.4th 621, 629 (7th Cir. 2022)—Count IV is **dismissed**.

*Count XI*

Finally, Count XI claims a violation of the children's substantive due process rights. The Saylors claim that their children had a "constitutional and emotional interest in stability and safety," and that Defendants' "repeated interviews, removal of siblings, and failure to provide a safe environment" violated these rights. (Am. Compl. ¶¶ 140–142, ECF No. 17.) Defendants contend that siblings cannot bring claims for loss of familial association under the Fourteenth Amendment. (Defs. Br. 13, ECF No. 24 (citing *Bell v. City of Milwaukee*, 746 F.2d 1205, 1247 (7th Cir. 1984), *overruled on other grounds by Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005)).)

In response, the Saylors seem to suggest that Defendants violated El.S.'s substantive due rights by creating the dangerous situation that led to her disappearance. (Pls. Resp. 5, ECF No. 28.) More specifically, Defendants improperly supervised El.S. while she was in foster care by giving her a cell phone that allowed her to make inappropriate contact with adult men as she had in the past, and not providing her with necessary intensive therapy services as she had been receiving in the Saylors' care. (Am. Compl. ¶¶ 44, 52, ECF No. 17.) The Court notes that the Saylors did not explicitly connect these dots. They argued that the state-created danger doctrine applied but did not say to which Count in the Complaint it related. (*See* Pls. Resp. 5, ECF No. 28.) But Count XI focuses on the children's Fourteenth Amendment rights, and, based on the facts alleged, only El.S.'s right to be free from

state-created danger could be implicated. The Court thus treats Count XI as raising this argument.

The Court finds that the Saylors state a claim only for a violation of El.S.'s right to be free from state-created danger against only those Defendants who were personally involved in creating the unsafe environment.

To start, two of the three factual underpinnings for this Count—the removal of siblings and repeated interviews—cannot support a substantive due process claim. Defendants are correct that individuals do not have a Fourteenth Amendment right to continued association with their siblings. *Bell*, 746 F.2d at 1247. So the children have no substantive due process claim arising from Defendants' removal of their siblings. And the defects with the repeated interviews allegation are twofold. First, the Fourteenth Amendment does not guarantee a general "interest in stability and safety." (Am. Compl. ¶¶ 140–142, ECF No. 17); *see Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 916 (7th Cir. 2015). To the extent this allegation also relates to the state-created danger argument, it falls far below the threshold needed for the doctrine to apply. Interviews are presumably a necessary part both of removing children from the home and investigating abuse and neglect. The Saylors do "not plead any facts suggesting that [performing mandatory] interview[s] actually increased the danger and caused harm to" the children. *Wright v. Shumate*, 181 F.4th 742, 750 (7th Cir. 2026). Nor does such conduct "shock[] the conscience." *Hoeppner*, 939 F.3d at 876 (internal quotation marks omitted). Thus, the Saylors fail to state a claim for violations of the children's Fourteenth Amendment rights based on these facts.

For the sole remaining factual allegation in this Count—that Defendants created an unsafe environment for El.S.—the Saylors fail to state a claim against some Defendants because they were not involved in the alleged misconduct. As in Count I, the allegations of creating an unsafe foster care environment for El.S. attribute wrongdoing exclusively to Case Managers Campbell and Greenwalt, Director Garrett, and Supervisors Broyles and Clanim. (Am. Compl. ¶ 52, ECF No. 17.) The Saylors allege that those Defendants approved El.S. having a cell phone so she could "be like other teenagers," despite the known and serious risks associated with her having a phone. (*Id.*) The Saylors also allege that three of these Defendants—Greenwalt, Garrett, and Broyles—"failed to provide [El.S. with the] intensive therapy services she needed," (*id.* ¶ 44), which also presumably contributed to the unsafe environment. As in Count I, that leaves DCS Director Krupp, Director Wilson, Case Manager Mansfield, and Foster Care Specialists Almack and Hensley as having played no role in the alleged misconduct. The Saylors, therefore, do not state a claim against these Defendants that were not personally involved.

The personally-involved Defendants, though, are not entitled to qualified immunity at present. At this stage in the litigation, the Saylors have stated a claim that these Defendants violated El.S.'s Fourteenth Amendment right to be free from state-created danger.

The Due Process Clause "generally confers no affirmative right to governmental aid." *Doe*, 782 F.3d at 916. But the Clause does "protect individuals against dangers the state itself creates." *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812,

817 (7th Cir. 2007). "The exception for state-created dangers is . . . quite narrow and reserved for 'egregious' conduct by public officials." *Hoeppner*, 939 F.3d at 876 (quoting *Doe*, 782 F.3d at 917).

"A due-process claim of this kind requires proof of three elements: (1) the government, by its affirmative acts, created or increased a danger to the plaintiff; (2) the government's failure to protect against the danger caused the plaintiff's injury; and (3) the conduct in question 'shocks the conscience.'" *Hoeppner*, 939 F.3d at 876 (quoting *Flint v. City of Belvidere*, 791 F.3d 764, 770 (7th Cir. 2015)). Under the first prong, a plaintiff can show the government "increased a danger" when its conduct "turned a potential danger into an actual one." *Id.* at 877 (quoting *Sandage v. Bd. of Comm'rs of Vanderburgh Cnty.*, 548 F.3d 595, 600 (7th Cir. 2008)). Under the causation prong, a plaintiff must show cause-in-fact and proximate causation. *Wright*, 181 F.4th at 749. Cause-in-fact requires that "the evidence supports [each] . . . link in th[e] chain" from the defendant's actions to the plaintiff's injury. Proximate cause requires that the plaintiff's injury be foreseeable. *Flint*, 791 F.3d at 770. Finally, "[t]he third element—conscience-shocking conduct—requires a culpable state of mind equivalent to deliberate indifference." *Hoeppner*, 939 F.3d at 876.

Here, the Saylors' allegations are sufficient to overcome the first prong of qualified immunity: They plausibly allege that Defendants violated El.S.'s right to be free from state-created danger.

First, taking the allegations in the Complaint as true, Defendants increased a danger to El.S. by providing her with a cell phone and taking away the intense

therapy she needed. With respect to at least these two conditions, Defendants left El.S. "in a worse position than before state intervention," *Wright*, 181 F.4th at 749; *see Doe*, 782 F.3d at 917, as the Saylors were providing El.S. with intensive therapy services and did not allow her to have a smartphone, (Am. Compl. ¶¶ 41, 43, ECF No. 17). Even though El.S. gained access to a smartphone while in the Saylors' care, the Saylors seemingly did all they could to prevent this from happening. (*See id.*) And when El.S. was found after she first ran away from home, it seems that phone was taken away. (*See id.* ¶ 52.) By the time she was in Defendants' care, the risks associated with El.S. having a smartphone were known and serious. She had a track record of using smartphones to send "naked and graphic pictures of herself" to adult men on social media. (*Id.* ¶ 22.) Her history also demonstrated that this concerning phone usage was prone to escalate further. What started as explicit conversations online turned to arranging for men to pick her up, getting "intoxicated on illegal substances and alcohol," being "sexually active" with these adult men, and making plans to flee the State with one of them. (*Id.* ¶ 25.) Defendants—knowing all these risks—nonetheless authorized El.S. to have a smartphone. (*Id.* ¶ 52.) That conduct "turn[ed] a potential danger into an actual one." *Doe*, 782 F.3d at 918.

Second, Defendants' decision to give El.S. access to this known danger caused her injury—here, her running away from home and ongoing disappearance of over two years. (Am. Compl. ¶¶ 52–56, ECF No. 17.) As alleged, the facts "support[] [every] . . . link in th[e] chain" to establish cause-in-fact. *Flint*, 791 F.3d at 770. Defendants authorized El.S. to have a smartphone while in foster care; she used that smartphone

to reinitiate contact with unknown men online; that contact led to her to again run away from home. (Am. Compl. ¶¶ 52–56, ECF No. 17.) Those clear and connected events support a finding of cause-in-fact. The allegations also support the existence of proximate cause. When El.S. first got a smartphone, she used it to contact men and run away. When Defendants gave El.S. a smartphone, she misused it in precisely the same way. El.S.'s injury was thus foreseeable.

Third, taking all allegations as true, the Saylors plausibly allege that Defendants' conduct "shocks the conscience." Defendants knew of all this troubling behavior stemming from El.S.'s cell phone use. (*See* Defs. Br. 11, ECF No. 24.) Indeed, Defendants seem to suggest that El.S.'s concerning phone use and resulting misconduct was a key reason they removed El.S. from the Saylors' home. (*See id.*) Though the Saylors and Defendants likely disagreed on whether the Saylors played any role in El.S. obtaining a smartphone initially, both parties agreed that El.S.'s phone usage was problematic, and the Saylors requested El.S. not get access to a phone in foster care. (Am. Compl. ¶ 52, ECF No. 17.) One would expect, then, that Defendants' and the Saylors' interests were aligned in this respect: that all would want boundaries in place to prevent El.S. from having a smartphone while in foster care. According to the allegations though, Defendants both ignored the Saylors' request and knowingly reintroduced the very threat for which they took El.S. from the Saylors in the first instance—giving her the tool needed to resume sexual contact with adult men and become a serious flight risk. And the alleged reason Defendants gave El.S. a phone? Social acceptance. (*Id.*) All those facts, if true, would

demonstrate a "deliberate indifference" to El.S.'s safety that would constitute "conscience-shocking conduct." *Hoeppner*, 939 F.3d at 876.

The Saylors thus adequately alleged a violation of El.S.'s substantive due process right to be free from state-created danger.

These allegations are also sufficient to overcome the second prong of qualified immunity: The right to be free from this type of state-created danger was clearly established.

The clearly established prong requires a plaintiff to either find closely analogous case holding such conduct illegal, *see Brokaw*, 235 F.3d at 1022, or show that "the unlawfulness" of such conduct is "apparent," *Anderson*, 483 U.S. at 640. For the right to be free from state-created danger though, the Seventh Circuit has seemingly addressed these rights at a lower level of generality: "It is clearly established that state actors who, without justification, increase a person's risk of harm violate the Constitution." *Paine v. Cason*, 678 F.3d 500, 510 (7th Cir. 2012), *as amended on denial of reh'g and reh'g en banc* (May 17, 2012). The Seventh Circuit has not explained how this standard complies with the general principle that a right can only be clearly established if defined at a precise enough level. *See id.*; *see also Anderson*, 483 U.S. at 639. To try to harmonize both binding standards though, the Court interprets the Seventh Circuit's test as falling under the *second* way to show a right is clearly established. In other words, it is "apparent" that conduct is unlawful, *Anderson*, 483 U.S. at 640, if that conduct "increase[s] a person's risk of harm" without any justification, *Paine*, 678 F.3d at 510.

Here, El.S. had a clearly established right to be free from this state-created danger. The Saylors have adequately alleged that Defendants increased El.S.'s risk of harm for no reason. According to the allegations, Defendants gave El.S.—a child who previously used a phone to engage in sexual relationships with adult men and run away from home with those men—a phone only so she could "be like other teenagers." (Am. Compl. ¶ 52, ECF No. 17.) Giving a teenager with her history and mental health conditions access to a phone that she has a recent history of dangerously misusing, and for no reason other than social acceptance, increases her risk of harm without justification. *See Paine*, 678 F.3d at 510. And it is "apparent," *Anderson*, 483 U.S. at 640, and thus clearly established, that creating that wholly unjustified and unnecessary risk violates El.S.'s rights to be free from state-created danger, *see Paine*, 678 F.3d at 510.

Accordingly, the Saylors state a claim that Defendants Campbell, Greenwalt, Garrett, Broyles, and Clanim violated El.S.'s substantive due process right to be free from state-created danger. But the Saylors fail to state a claim against Defendants Krupp, Wilson, Mansfield, Almack, and Hensley because they were not personally involved in creating these unsafe conditions.

* * *

In sum, the substantive due process claims asserting violations to the Saylors' right to direct the care of their children, Counts II and IV, are **dismissed**. The Saylors adequately state substantive due process claims against Defendants Campbell, Greenwalt, Garrett, Broyles, and Clanim for a violation of their and El.S.'s

rights to familial integrity in Count I. They also adequately state a claim against these Defendants for a violation of El.S.'s right to be free from state-created danger in Count XI. The Saylors state no viable substantive due process claim against Defendants Krupp, Wilson, Mansfield, Almack, and Hensley.

*ii. Fourth Amendment, Count III*

The Saylors allege that the seizure of El.S. and the two foster children violated these children's Fourth Amendment rights.[7] (Am. Compl. Count III, ECF No. 17.) Defendants argue that, given the circumstances surrounding El.S.'s running away from home and her allegations about the Saylors, they "were justified in removing El.S. from the home," so no Fourth Amendment violation occurred. (Defs. Br. 12, ECF No. 24.) They also argue that, even if they did violate El.S.'s rights, the contours of those rights were not clearly established enough for them to be held liable. (*Id.*) The Court finds that the Saylors state a claim against some Defendants.

Begin with the relevant Fourth Amendment standard: "In the context of removing a child from his home and family, a seizure is reasonable [1] if it is pursuant to a court order, [2] if it is supported by probable cause, or [3] if it is justified by exigent circumstances." *Brokaw*, 235 F.3d at 1010. Here, because the children's removal was not pursuant to a court order, (Am. Compl. ¶ 100, ECF No. 17), it must have been

---

[7] The Saylors allege that the seizure of the children violated "Plaintiffs'" Fourth Amendment rights. (*See* Am. Compl. Count III, ECF No. 17.) Phillip and Elizabeth, however, cannot maintain claims under the Fourth Amendment because "[t]hey were not seized." *Hernandez*, 657 F.3d at 474. But they can assert substantive due process claims premised upon the children's seizure, *id.*, and those claims were analyzed above. This section thus addresses the claims of only those individuals whose Fourth Amendment rights could be implicated: the children.

supported by probable cause or justified by exigent circumstances to qualify as reasonable, *see Xiong v. Wagner*, 700 F.3d 282, 290 (7th Cir. 2012). "Probable cause is an objective inquiry, focused . . . on whether 'a prudent caseworker (meaning one of reasonable caution) could have believed that [the children] faced an *immediate* threat of abuse.'" *Mabes v. Thompson*, 136 F.4th 697, 708 (7th Cir. 2025) (emphasis added) (quoting *Siliven*, 635 F.3d at 927), *reh'g en banc denied*, Nos. 24-1048 & 24-1082, 2025 WL 1666751 (7th Cir. June 12, 2025), *cert. denied*, 146 S. Ct. 1607 (2026). Exigent circumstances exist only if a state officer has "reason to believe that life or limb is in *immediate* jeopardy." *Brokaw*, 235 F.3d at 1010 (emphasis added) (quoting *Tenenbaum v. Williams*, 193 F.3d 581, 605 (2d Cir. 1999)). So both probable cause and exigent circumstances require a reasonable belief of immediate harm.

As before, the Saylors fail to state a claim against some Defendants. Though the Saylors generally allege that "DCS" seized the children, the Court infers that these Fourth Amendment claims are asserted against Case Managers Campbell and Greenwalt, as well as Director Garrett, and Supervisors Broyles and Clanim in their supervisory roles. (Am. Compl. ¶¶ 29–31, ECF No. 17.) So as with the substantive due process claims, the Saylors fail to state a claim against Defendants Krupp, Wilson, Mansfield, Almack, and Hensley because they were not personally involved in seizing the children.

As to the foster children, it is unlikely that they have a constitutionally protected right to remain with their foster parents. *See Kyees*, 600 F.2d at 698 ("[F]oster families . . . enjoy[] a considerably more limited 'liberty' than natural families or those

related by adoption."); *see also Ramsey*, 2018 WL 4846299, at *8 ("[T]here is no categorical liberty interest in foster family relationships."). And if they do have such a right, it is not clearly established. *See Kyees*, 600 F.2d at 698. So the Saylors do not state a viable Fourth Amendment claim for the seizure of the foster children.

But as to El.S., the Court finds that the Saylors have adequately alleged at this stage that Defendants violated her Fourth Amendment rights. Under prong one of qualified immunity, the question is whether the Saylors alleged facts sufficient to show "the deprivation of a constitutional right." *Tamayo*, 526 F.3d at 1090. The Court cannot give Defendants' contrary narrative any weight. *Iqbal*, 556 U.S. at 678.

The facts relevant to El.S.'s right against being seized largely overlap with the facts relevant to the Saylors' rights against having El.S. removed. Taking all inferences in the Saylors' favor, Defendants could not have reasonably believed there was any immediate need to remove El.S. from the home. As explained above, the Saylors allege that Defendants refused to acknowledge the extensive evidence showing that they adequately cared for El.S., failed to meaningfully investigate El.S.'s false allegations, and ultimately fabricated evidence to wrongly call into question the Saylors' parental fitness. Defendants also ignored the crucial fact that the Saylors were the ones to immediately report El.S.'s misconduct to the police. Even if Defendants were suspicious that the Saylors played some role in allowing El.S.'s behavior to escalate, these facts do not constitute one of those "rare circumstances [where] allegations of neglect [are] . . . so credible and severe that they justify a pre-investigation and pre-hearing removal." *Brokaw*, 235 F.3d at 1011. Taking all

inferences in the Saylors' favor, Defendants lacked the imminency required to remove El.S. without a court order, and that unjustified removal violated El.S.'s Fourth Amendment rights.

The Saylors' allegations are also sufficient to survive the second prong of qualified immunity. "[T]ak[ing] as given the plaintiffs' allegations," *Hanson*, 967 F.3d at 597, the alleged right at issue here was clearly established, *Hardeman*, 933 F.3d at 823. As the Court explained with the Count I allegations, it is clearly established that it is "unconstitutional to use the government's power to cause, or conspire to cause, the unjustified removal of a . . . child from his parents." *Brokaw*, 235 F.3d at 1022. Because this right is clearly established, the Defendants involved in seizing El.S. hold no qualified immunity against this claim at this stage.

Accordingly, the Saylors state a Fourth Amendment claim against Defendants Campbell, Greenwalt, Garrett, Broyles, and Clanim but not against Defendants Krupp, Wilson, Mansfield, Almack, and Hensley.

*iii. Procedural due process, Count XIII*

Count XIII asserts what the Court interprets as a procedural due process claim. (Am. Compl. Count XIII, ECF No. 17 (titled "Fabrication of Evidence").) The Saylors allege that Defendants "used fabricated evidence in child welfare proceedings," and "continued to maintain a false neglect finding."[8] (*Id.* ¶¶ 147–50.) The Saylors

[8] As part of this claim, the Saylors also alleged that Defendants "misrepresented facts to the court." (Am. Compl. ¶ 147, ECF No. 17.) But, as the Court noted earlier, Defendants hold absolute immunity against claims arising from misconduct during a judicial proceeding. *Buckley*, 509 U.S. at 272–273. So the Court does not address that factual allegation here.

seemingly bring this claim on their and the children's behalf. (*Id.*) A procedural due process claim requires "the defendants [to have] deprived the plaintiff of a protected liberty or property interest" without giving "due process." *Brokaw*, 235 F.3d at 1020. Because only the Saylors' and El.S. have any cognizable due process claim, *see supra*, this Count could only be asserting a violation of their—and not any of the other children's—procedural due process rights.

Defendants respond that the Saylors have not identified what the allegedly false statements were, and without those facts, the allegations are too general to state a claim. (Defs. Br. 15, ECF No. 24.) Defendants further argue that only material misstatements in CHINS petitions violate a person's constitutional rights, and the alleged fabricated and omitted statements here were not material enough to the petition to violate the Saylors' rights. (*Id.*) Finally, Defendants contend that, in the CHINS proceeding, the Saylors had the opportunity to "present alternative evidence," which eliminates the alleged constitutional defect of any misstatements in the petition. (*Id.*)

The Court finds that the Saylors state a claim against some Defendants.

"[D]ue process 'at a minimum . . . requires that government officials not misrepresent the facts in order to obtain the removal of a child from his parents.'" *Mabes*, 136 F.4th at 710 (quoting *Hernandez*, 657 F.3d at 484–85). A child or her parents may state a claim for procedural due process where the child was "removed [from their home] based on knowingly false statements of child neglect, . . . without

an investigation, a pre-deprivation hearing, or exigent circumstances." *Brokaw*, 235 F.3d at 1021.

Here too, the Saylors fail to state a claim against some Defendants. As with all the claims so far, Count XIII involves conduct attributable to Defendants Campbell, Greenwalt, Garrett, Broyles, (Am. Compl. ¶¶ 29–31, ECF No. 17.), but not Defendants Krupp, Wilson, Mansfield, Almack, and Hensley, (*see id.*). So the Saylors fail to state a claim against this latter group of Defendants.

But the Saylors state a procedural due process claim sufficient to survive the 12(b)(6) motion against the personally-involved Defendants. Defendants are correct that the Saylors' did not specify what fake allegations Defendants created. But, as in *Brokaw*, the Saylors have "alleged that the entire proceeding to secure [El.S.'s] removal was a sham, with no merit to any of it," *Mabes*, 136 F.4th at 710 (citing *Brokaw*, 235 F.3d at 1020)—and they have alleged at least some facts plausibly supporting that claim. Defendants seemed hurried to remove El.S. from the home even though the circumstances did not seem to suggest the Saylors were abusive or neglectful. Some investigation or corroboration would have made it obvious to Defendants—if it was not already—that El.S.'s allegations were false and the Saylors were able and willing to continue caring for their difficult child. Although this is a closer call, at this stage in litigation, those facts are sufficient to state a claim.

Accordingly, the Saylors state a procedural due process claim against Defendants Campbell, Greenwalt, Garrett, Broyles, and Clanim but not Defendants Krupp, Wilson, Mansfield, Almack, and Hensley.

*iv. Equal protection, Count XII*

The Saylors allege that Defendants violated their Fourteenth Amendment rights by treating them differently than similarly situated foster or adoptive parents by "refusing to honor favorable court rulings, revoking their [foster] license[,] and blocking [the] adoption [of G.W.] without [a] rational basis." (Am. Compl. ¶ 114, ECF No. 17.) The Saylors further allege that Defendants "were motivated by retaliatory or discriminatory animus." (*Id.* ¶ 145.) Defendants counter that this claim must fail because there is a rational basis for their actions and, in any event, it is not clearly established that their actions violated the Fourteenth Amendment. (Defs. Br. 14–15, ECF No. 24.) The Court agrees with Defendants that here the Saylors fail to state a claim.

"The Equal Protection Clause . . . protect[s] individuals against purely arbitrary government classifications, even when a classification consists of singling out just one person for different treatment for arbitrary and irrational purposes." *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012). The Saylors assert this "class-of-one" equal protection violation.

To state a class-of-one claim, a plaintiff must allege that they were "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008). "The rational-basis requirement sets the legal bar low." *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013). It "simply requires 'a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *Id.*

(quoting *Srail v. Vill. of Lisle*, 588 F.3d 940, 946 (7th Cir. 2009)). And there exists a presumption that government action is rational. *Id.* "[A]n allegation of improper motive" on its own does not "overcome th[at] presumption." *Id.* So even if the facts suggest the action was "taken out of animosity," *id.* (quoting *Flying J. Inc. v. City of New Haven*, 549 F.3d 538, 546 (7th Cir. 2008)), the action is constitutional if there exists any "conceivable rational basis" for it, *Chi. Studio Rental, Inc. v. Ill. Dep't of Com.*, 940 F.3d 971, 980 (7th Cir. 2019).

Here, the Saylors fail to state an equal protection claim.

To start, the Court notes that the Saylors' allegations are at times inconsistent. For example, they allege that Defendants revoked their foster license and objected to G.W.'s adoption while the CHINS proceeding was pending. (*See* Am. Compl. ¶¶ 35–36, ECF No. 17.) Later, however, the Saylors allege that Defendants Allmack and Hensley recommended the revocation of the Saylors' foster license even after the conclusion of the CHINS proceeding. (*Id.* ¶ 62.) Moreover, it is not clear what the Saylors mean when they allege that Defendants "refus[ed] to honor favorable court rulings." (*Id.* ¶ 144.) In one instance, they allege that Defendants "failed to take corrective action despite clear notice" that their "actions violated court orders," (*id.* at ¶ 36), however they do not identify the specific actions Defendants were ordered to undertake. Similarly, they do not claim that the state court's finding that El.S. was not a CHINS required Defendants to reverse course on the foster license and adoption issues or to unsubstantiate allegations against the Saylors.

Construing the Saylors' Amended Complaint generously, the Court infers that the Saylors take issue with Defendants' objection to G.W.'s adoption and revocation of the foster license while the CHINS proceeding was pending, and with Defendants' failure to alter their stance on either issue even after the state court determined that El.S. was not a CHINS.

Each of these actions, however, is supported by a conceivable rational basis for differential treatment. While a CHINS proceeding was pending, it is understandable that Defendants would oppose a foster family's adoption of another child and seek revocation of their foster license: Defendants had initiated those proceedings based on allegations of abuse and neglect. (Am. Compl. ¶ 27, ECF No. 17.) Even after the state court determines that a child was not a CHINS, it would still be rational for Defendants—who substantiated allegations and filed the CHINS petition—to remain suspect of the foster parents' ability to serve as capable adoptive and foster parents. And looking specifically here at the circumstances leading to the CHINS petition, including El.S.'s flight and subsequent hospitalization, Defendants may have rationally concluded that the Saylors were inadequate adoptive or foster parents, even if they had not abused or neglected El.S. The Court cannot conclude that it was irrational for Defendants to "refus[e] to honor favorable court rulings," that is, refuse to reverse their stance on the adoption and foster license. And the Saylors' claim that Defendants had a discriminatory motive does not change that Defendants' actions had a rational basis and therefore did not violate the Equal Protection Clause. *See Kopp*, 725 F.3d at 686.

For the above reasons, the Court finds that there is a conceivable rational basis for each action the Saylors assert violated the Equal Protection Clause. Accordingly, the Saylors have failed to state an equal protection claim. *See Ind. Land Tr. #3082 v. Hammond Redevelopment Comm'n*, 107 F.4th 693, 698 (7th Cir. 2024) (concluding that finding "a rational basis for the [defendant's] conduct" is a "sufficient reason for dismissing the [class-of-one] claim"). This Count is **dismissed**.

*v. First Amendment retaliation, Count XIV*

The Saylors allege that Defendants retaliated against them for "exercis[ing] their constitutional right to [p]etition the government by litigating [CHINS] petitions and prevailing." (Am. Compl. Count XIV, ECF No. 17.) They allege that, because they participated actively in the CHINS case, Defendants revoked their foster license, objected to G.W.'s adoption, refused to unsubstantiate allegations against them, "continued the children . . . outside of the family home," forced the Saylors to "participate in unnecessary services, "belittled their character" in court, and "further traumatized the children." (*Id.* ¶ 153.) Defendants argue that this claim should be dismissed because the Saylors failed to provide "any factual basis" to support it. (Defs. Br. 16, ECF No. 24.)

A First Amendment retaliation claim requires a plaintiff to plausibly allege that "(1) [they] engaged in activity protected by the First Amendment, (2) [they] suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment activity . . . was 'at least a motivating factor' in the Defendant's decision to take the retaliatory action." *145 Fisk, LLC v. Nicklas*, 986

F.3d 759, 766 (7th Cir. 2021) (quoting *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)).

The Saylors' allegations are sufficient to state a claim. On the first prong, engaging in litigation is a protected First Amendment activity, *145 Fisk*, 986 F.3d at 766, so the Saylors' participation in the CHINS case meets that standard. The Court also assumes for sake of argument that the alleged deprivations—revoking a foster license, objecting to adoption, refusing to unsubstantiate allegations of abuse and neglect, keeping children outside the home, and belittling one's character—if done in retaliation, could deter foster parents from defending CHINS cases. Under the third prong the allegations, though sparce, are sufficient for this stage. The Court must take all inferences in the Saylors' favor, and they have alleged some facts that support the inference that Defendants retaliated. For example, they allege that Defendants doubled down on false allegations after the Saylors tried to convert the CHINS abuse and neglect proceeding to the seemingly more appropriate "danger to oneself" proceeding. Taking all inferences in the Saylors' favor, the Saylors tried to augment the record with facts showing their parental fitness, but Defendants submitted to the court intentionally contradictory—and false—allegations to keep their parental fitness in dispute. (Compl. ¶¶ 33, 41, ECF No. 17.) They then doubled down on these falsified allegations, updating the neglect petition to include them. (*Id.* ¶ 33.) The Saylors at this stage have alleged just enough "factual content to 'nudge' [their] claim . . . 'across the line from conceivable to plausible.'" *McCauley v. City of Chicago*, 671 F.3d 611, 618 (7th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 680).

Accordingly, the Saylors state a First Amendment retaliation claim. As with the other claims, though, the Saylors only state a claim with respect to Defendants Campbell, Greenwalt, Garrett, Broyles, and Clanim. The remaining Defendants played no role in filing or litigating the CHINS petition, and the Saylors have not alleged any other First Amendment protected activity for which those Defendants could have retaliated against them. So the Saylors fail to state a claim against Defendants Krupp, Wilson, Mansfield, Almack, and Hensley.

*vi. Conspiracy, Count VII*

The Saylors allege that the Defendants conspired to violate their rights by making false allegations, obstructing their adoption of G.W., revoking their foster care license, repeatedly interviewing the children, and refusing to return G.W. to their care even after the state court found the Saylors not abusive or neglectful. (Am. Compl. ¶¶ 125–126.) Defendants' sole argument in favor of dismissing the conspiracy count is that the Saylors "underlying constitutional claims fail" so "the conspiracy claim must also fail." (Defs. Br. 13, ECF No. 24.) Because the Court has found that some of the constitutional claims may proceed, the Court disagrees with Defendants' argument. The Saylors state a claim against some Defendants.

"A § 1983 conspiracy claim requires both (1) an underlying constitutional violation and (2) an agreement among the defendants to inflict the unconstitutional harm." *Green v. Howser*, 942 F.3d 772, 778 (7th Cir. 2019). Such agreements can be implicit. *See id.* at 779.

The Saylors have adequately alleged at this stage a conspiracy to violate their rights. First, they adequately alleged underlying constitutional violations arising from Defendants making false allegations, performing a sham investigation, and removing El.S. *See supra*. The Saylors have also alleged facts sufficient to infer an agreement. Consistently throughout the Complaint, the Saylors allege facts that support the inference that Defendants worked in concert to accomplish these constitutional violations. At this stage—and particularly because Defendants challenge this claim only on the basis that the underlying constitutional claims fail—the Saylors state a claim for conspiracy.

But this claim can proceed against only Defendants Campbell, Greenwalt, Garrett, Broyles, and Clanim. Based on the analysis above, the Saylors have failed to state any viable claim against Defendants Krupp, Wilson, Mansfield, Almack, and Hensley. As such, the Saylors necessarily fail to state a conspiracy claim against them.

## IV. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss, (ECF No. 23), is **granted in part** and **denied in part**. All federal and state claims against DCS and its employees in their official capacities are **dismissed**. Claims for injunctive relief to bring about institutional DCS reform or stop violations of state law are **dismissed**. All state law claims, Counts V, VI, VIII, IX, and X, are **dismissed**. The federal claims in Counts II, IV, and XII are **dismissed**. The frivolous litigation claim is **dismissed**.

Because there are no viable claims against DCS, or Defendants Krupp, Wilson, Mansfield, Almack, and Hensley, they are **dismissed** from the case.

Thus, all that remains is: *Young* injunctive relief for violations of federal law—to the extent any such violations exist; declaratory relief[9]; and the following federal claims for damages against Defendants Campbell, Greenwalt, Garrett, Broyles, and Clanim in their personal capacities: Count I asserting violations of the Saylors' and El.S.'s rights to familial privacy; Count XI asserting a violation of El.S.'s right to be free from state created danger; Count III asserting a violation of El.S.'s Fourth Amendment rights; Count XIII asserting violations of the Saylors' and El.S.'s procedural due process rights; Count XIV asserting violations of the Saylors' First Amendment rights; and Count VII alleging a conspiracy claim.

**SO ORDERED.**

Date: 09/30/2026

JAMES R. SWEENEY II, CHIEF JUDGE
United States District Court
Southern District of Indiana

---

[9] Though far from the focus of the Saylors' requested relief, they also seek "[d]eclaratory relief" that Defendants violated their federal constitutional rights. (Am. Compl. ¶ 157.) Declaratory relief is proper where it would dispel "the uncertainty and controversy that created the issues." *NUCOR Corp. v. Aceros Y Maquilas de Occidente*, 28 F.3d 572, 578 (7th Cir. 1994). Courts retain discretion whether to entertain declaratory relief. *Id.* And courts may dismiss claims for declaratory relief where they are "substantively identical to," and thus "duplicative" of, other claims in the case. *Levy*, 44 F.4th at 629. Because, however, Defendants have not challenged the Saylors' request for declaratory relief, the Court leaves this question for another day.

Distribution:

Dorothy Ferguson
yourattorneydoferg@yahoo.com

Eric Ryan Shouse
Lewis And Wilkins LLP
shouse@lewisandwilkins.com

William Dean Young
Lewis And Wilkins LLP
young@lewisandwilkins.com